IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

ONYX FILMS LLC
   d/b/a ONYX MEDIA FILMS LLC

and

JACQUELINE W. MARQUEZ

     Plaintiffs,

v.

SUSAN KOCH

and

CABIN FILMS LLC

    Defendants.

Civil Action No._____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs, Onyx Films LLC (Onyx) and Jacqueline W. Marquez (Marquez), by counsel, bring this action against defendants Susan Koch (Koch) and Cabin Films LLC (Cabin) and states as follows:

## INTRODUCTION

1. The parties are joint venture partners in the creation and production of a documentary film initially titled *Music Lessons,* ultimately screened as *Music Got Me Here*. This is an action for breach of contract, including breach of fiduciary duty, breach of duty of loyalty and breach of good faith and fair dealing. Plaintiffs seek damages, an accounting and injunctive and declaratory relief with respect to the

parties' documentary film, a constructive trust, and other equitable relief as the evidence may require.

## PARTIES

2. Plaintiff Onyx Films LLC is a limited liability company existing under the laws of the Commonwealth of Virginia. Onyx also conducts business as Onyx Media Films. Marquez is the sole owner and managing member of Onyx.

3. Plaintiff Jacquelyn W. Marquez is a citizen and resident of McLean, in Fairfax County, Virginia. She is a filmmaker, producer and the president and CEO of Onyx. She was the president and CEO of EVS Communications, Inc. from 1997 to 2009. Marquez was Vice President and General Manager of ZGS Broadcast Holdings, a communications company where she supervised the daily operations and advertising sales of eleven Telemundo network affiliates. In 2009 she became the President of Onyx and EVS Communications, both firms whose mission is to produce television programs and films that address social issues. Her latest film *Harvest of Empire*, prior to *Music Lessons* opened to great reviews in the New York Times, Los Angeles Times and the Washington Post and was the winner of the prestigious International Documentary Association Award, the CINE Golden Eagle Award and the IMAGEN Award. Mrs. Marquez uses her name "Wendy" and will be referred to by that name in much of the evidence in this matter.

4. Defendant Susan Koch is a citizen and resident of the Maryland. Koch directs, writes and produces documentaries and nonfiction programming. Koch's films have won EMMY and Peabody awards and others. Her works have been featured at film

festivals and have been broadcast on the major networks and PBS, HBO, ESPN, Showtime, The Learning Channel, National Geographic and others. Based upon information and belief, Susan Koch is the sole owner and member of Cabin Films LLC.

5. Defendant Cabin is a limited liability company existing under the laws of the state of Maryland. Cabin is not registered to do business in the Commonwealth of Virginia but conducts business in Virginia.

### JURISDICTION AND VENUE

6. This case is based on diversity of the parties who are citizens of separate states. This court has jurisdiction under 28 U.S.C. §1332. The amount in controversy exceeds $75,000, not including interest and costs of court, giving this court jurisdiction over the state law claims stated herein, each of which arise out of a common nucleus of operative facts.

7. Venue in this judicial district is proper under §28 U.S.C.1391(a) and (b) (2), location of the subject contract execution and substantial contract performance, and §28 U.S.C.1391 (c).

8. The contract the subject of this action was negotiated and entered into in Virginia. The persons and music therapy practice featured in the documentary film, the subject of this suit, are in Virginia. Filming was performed primarily in Virginia.

### FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

9. In 2013, after Marquez and Koch met and worked together in

connection with a Virginia local film festival, Koch approached Marquez in Virginia regarding a joint venture. Koch asked Marquez if she and her company Onyx would consider collaborating as partners with her and her company, Cabin Films, in the creation of two documentary films; especially one regarding a Virginia musical therapist who was successfully using music as a healing and rehabilitative therapy with severely injured patients.

10. Koch sent an email to Marquez on February 11, 2013 with information regarding the two films for Marquez's consideration. On February 12, 2013, Koch sent a second email indicating her eagerness to meet with Marquez, especially regarding the documentary film then titled *Music Lessons*.

11. Koch and Marquez met at the Ritz Carlton in Tysons Corner, Virginia on March 6, 2013 to discuss terms of a partnership for the creation and production of *Music Lessons*. In that discussion they agreed that if Onyx and Marquez, after meeting the persons to be featured in the film and investigated the setting and circumstances, decided to proceed with the film, they, and their respective companies would partner in the creation of that documentary film; would share all profits and savings 50/50; and all arrangements or agreements with outside parties would be approved by both. They agreed that Koch would work primarily on the creative side (filming and editing) and that Marquez would work primarily on production (fundraising, marketing, PR and distribution). They agreed that each would seek the others approval for anything related to the film, if both decided to go forward.

12. Koch identified the music therapist and arranged for Marquez to visit with

him to discuss his work as part of considering joining the film venture.

13. Though initially reluctant to partner in the film, Marquez met with the music therapist in Loudoun County Virginia. She also met and spoke with some of his patients and their parents. She found their work and personal stories important and compelling.

14. Thereafter, Marquez and Koch had multiple discussions and meetings about the project beginning in March 2013. After sharing ideas, terms and conditions for a joint effort, Marquez and Onyx accepted Koch's invitation to partner in creating the documentary film, initially titled *Music Lessons* ultimately screened as *Music Got Me Here*.

15. Marquez provided a written draft of their agreement to Koch via email, on June 28, 2013.

16. Marquez and Koch then met in Tysons Corner, Virginia in early July 2013 and executed a written agreement memorializing the terms of their joint venture.

17. Marquez and Onyx agreed with Koch and Cabin as follows:

> "MEMORANDUM of UNDERSTANDING
> BETWEEN
> CABIN FILMS (Ms. Susan Koch)
> Onyx Media Films J. Wendy Thompson-Marquez
>
> This agreement is to confirm that Susan Koch (director) and J. Wendy Thompson-Marquez (producer) agree to collaborate on the documentary Music Lessons, title is subject to change.

5

> The parties to sign this agreement are, Wendy Thompson-Marquez (as the producer) and by Susan Koch, as the director of the film Music Lessons. Agree to the following terms:
>
> 1) The credits will read as directed by Susan Koch and produced by J. Wendy Thompson-Marquez, a production of Cabin Films in association with Onyx Films. There will be no additional producer listed on the credits unless both parties agreed on adding and additional producer. Eduardo Lopez, founder of EVS Communications will be listed as co-producer.
> 2) EVS Communications has been designated as fiscal sponsor of the film.
> 3) Both CABIN Films and EVS Communications will collaborate in the fundraising process. However, J. Wendy Thompson-Marquez will be the person designated to raise the funds needed
> 4) All profits from the film will be split 50/50 between CABIN Film and Onyx Media Films.
> 5) Any collaborations or agreements made for the production of the film should be subject to agreement by both parties.
> 6) Both parties agree to discuss any changes made to the current budget which is enclosed as exhibit A on this document.
> 7) Any savings generated from this production should be split 50/50 between the two parties."

18. It was agreed that Koch would receive, deposit and maintain the accounts for all funds raised and all disbursements for the film venture in the name of the film after receiving donor funds from the 501(c)(3) fiscal sponsors obtained by Marquez.

19. Marquez developed fundraising strategies, reviewed and approved by both partners. Marquez began fundraising and organized and executed dozens of

marketing and fundraising events. These events were designed to garner moral and fiscal support for production of the film.

20. Marquez's efforts were successful. Sufficient funds were raised to permit Screening of the documentary film in 2017 at the Middleburg Film Festival in Middleburg, Virginia.

21. Following the execution of the parties' agreement in 2013 the work on raising funds and making of the film proceeded in conformity with the parties' agreement with consulting and agreeing on all matters being their working custom and practice. During this time the parties performed their primary rolls and shared rolls as described in the agreement, including but not limited to the following:

    a. Negotiated and agreed upon the film's production budget, executive summary and proposal statement.

    b. In June 2014 Koch and Marquez jointly agreed to hire a social media and PR person. Both negotiated and agreed on the hiring of that person and the salary.

    c. Both Marquez and Koch worked to create a "Kickstarter" campaign to garner additional funding for the film in 2014.

    d. In early 2015, the parties agreed to the engagement of a commissioned fundraiser to assist with fundraising for the film. The partners agreed on the selection and terms for this employee.

    e. On at least two occasions, the parties agreed to replace the editor working on the film. In 2015, the film needed to replace the editor.

      Marquez conducted the search, vetted those qualified, gave Koch the best candidate's information for interview with Koch. Both partners then agreed to the terms and hiring the new editor.

f. Salaries, fees and other filming and production issues were discussed and agreed upon between the parties.

g. In addition, the partners consulted and agreed upon the text of the film's website, social media, communications, marketing materials and solicitation documents.

h. The parties studied distribution options, including self-distribution and planned to evaluate and agree at the appropriate time.

i. Coordinated giving levels and gifts, attributions and credits for those levels, including mentions and listings on website and other media.

j. Composed and sent joint thank you letters to contributors including those who gave during the Kickstarter campaign.

k. Prepared and gave themselves equal billing on the film's website and on written materials used to solicit contributions and in a television story about the film run by WNBC 4 Washington.

l. Were featured together in a local magazine article.

22. On Friday, January 29, 2016 the parties met in Tyson's Corner, Virginia to discuss progress and next steps for the film, now titled *High Notes*. Koch stated there was a need for additional fundraising and the budget needed to be revised. Not having access to the financial records, Marquez expressed concern that the partners be

transparent and accountable to the donors and potential donors with respect to financial documentation and adherence to the budget. Marquez also urged that it was important to assess carefully the amount of additional funding needed to maintain credibility. Koch agreed. Marquez developed additional fundraising activities.

23. Marquez organized a meeting among an associate producer, an executive producer, Koch and Marquez in March 2016 at the Tower Club in Tyson's Corner, Virginia. The purpose was to show film excerpts and seek additional funding. At that meeting Koch told those present that she "had not paid herself anything", that she was basically "working for free." Hearing this statement and being surprised by it, Marquez privately requested cancelled checks, invoices and receipts to ascertain how the money had been spent from Koch. Koch ignored her request.

24. By email from Marquez to Koch dated April 5, 2016, Marquez again expressed her concern about the budget and credibility with donors being solicited who had already given and said in part,

> "Previously you mentioned that we need to increase the budget $50K. I am a bit concerned about that because I feel we lose credibility when we need to make changes to the budget. So far, I have not received any payment for my work which was budgeted in the proposal. I am willing to take a cut, but it will be very helpful for me to know where we are financially based on budgeted expenses. Please let me know of your availability to discuss the budget based on actual expenses so we can plan accordingly."

25. In a reply email dated April 5, 2016 Koch explained her view of the need for additional funding over the budget and concluded

>"This week I am swamped between filming and editing but I will put together a report on the actual expenses next week – and then we can schedule a time to talk. Susan."

26. On June 16, 2016 Marquez sent an additional email communication to Koch,

>"Before you leave for LA, I would like to meet with you to review expenses and budget. You have indicated in a previous email that you could meet in June. Send me some that work for you."

By email on June 30, 2016 Koch replied to Marquez,

>"I will send you an accounting of expenses to date on the various line items in the budget next week."

After another request, another response came from Koch on July 4, 2016 saying, "I will be sending you a financial update for *High Notes* this week."

27. On several occasions thereafter defendant Koch transmitted proposed budget revisions and lists of expenditures but never provided financial documentation, canceled checks, bank statements, invoices or receipts to plaintiffs despite multiple requests. On these lists, Koch represented that she had paid herself $44,000.00.

28. Marquez responded with suggested budget revisions, offered to do additional work but continued to have serious concerns about lack of disclosure. Marquez also continued requesting this information.

29. Marquez continued to raise funds for completion of the film. Her focus was on completion of the film and protecting the interests of the donors and the

featured music therapist and his patients who were invested in the film's completion and success.

30. Following Marquez's requests for financial records, the relationship between the parties took a downturn. Koch began actions to relegate Marquez to a more limited, restricted role and presence in the film's production and promotion than provided by their agreement. By her behavior and comments to Marquez and to others Koch began a pattern of treatment toward Marquez including ignoring her, not introducing at gatherings for the film, failing to inform her of events, scheduling, expressions of interest and business opportunities, and other acts of exclusion. Marquez continued her work on the film.

31. No financial accounting with proof of costs and disbursements has been shared with plaintiffs despite repeated requests orally and in writing.

~~but only a list of some expenditures has been provided via email from Ms. Koch's husband on November 19, 2018.~~ [Formatted: Justified]

32. Upon information and belief, defendants sold, assigned, optioned or otherwise alienated ~~-~~ the documentary film, ~~-~~ to a major ~~another~~ production ~~or movie~~ company, Metro Goldwyn Mayer (MGM) to produce a feature film for national and international dissemination. This was done without notice to Plaintiffs and without Plaintiffs' consent. ~~with the intent to treat the venture's assets as their sole property, in violation of the parties' agreement and in violation of fiduciary duties and duties of loyalty, good faith and fair dealing owed to plaintiffs.~~

11

33. With this news and information regarding additional screenings, Marquez contacted Koch by email on January 15, 2019 and reminded her that plaintiffs must be included in contracts and other business related to the film. She also asked about the producer's fee and other income that may have been received.

34. Koch refused to make any distribution toward payment of the budget item for the producer and refused to~~would not~~ discuss the parties film ownership agreement.

35. By email dated February 26, 2019, Koch directed Marquez to contact her Attorney.  Marquez did this through her attorney. By email dated June 21, 2019 Marquez' attorney communicated with Susan Koch' attorney~~KOCH~~ regarding these issues and specifically requested "complete financial information including cancelled checks."

36. In response Marquez received through her attorney, a letter from an attorney representing Koch and Cabin dated September 11, 2019 directing that Marquez never contact Koch~~KOCH~~ again or attempt to ~~speak~~ with her. He represented he was directed to "terminate" Onyx and Marquez from all future "participation" in the film.

37. Plaintiffs have no alternative remedy but seek redress from this court.

### COUNT I

### BREACH OF CONTRACT

38.  Plaintiffs repeat and reallege all the other paragraphs contained herein as

if fully set forth in this count and incorporated herein by reference.

39. Under the facts alleged here, the parties created a joint venture to create the documentary film and thereby owed fiduciary duties, a duty of loyalty and a duty of good faith and fair dealing, each to the other. Defendants owed these duties to Plaintiffs.

40. Plaintiffs as partner in a joint venture under Virginia law, have the right to full transparency and access to all the records and assets of the venture. Defendants owed these duties to Plaintiffs.

41. Defendants, with the intent to exclude plaintiffs and to treat the venture's assets as their sole property, in violation of the parties' agreement and in violation of fiduciary duties and duties of loyalty, good faith and fair dealing owed to plaintiffs, sold or otherwise alienated the film and related rights to MGM and perhaps others in violation of the plaintiffs' ownership rights, copyright, rights to the film's profits, producer fees, film credits, raw film, archived and edited footage, expenses and other assets.

42. Defendants have willfully, wantonly and wrongfully and in violation of their legal, fiduciary and contractual duties converted the property of the venture to their own. They have refused to provide plaintiffs access and equal control over the film produced by the venture, access to the books and records, cancelled checks, bank statement, invoices, expenses for the venture, refused to provide any meaningful

13

accounting with respect to the disbursements of the venture; refused and expelled plaintiffs from participation in essential steps in the completion of the venture including access to and commentary in collaboration with respect to editing and marketing the film, reimbursed themselves without accounting to plaintiffs.

43. Defendants wrongful conduct toward plaintiffs has deprived both Onyx and Marquez of professional business relationships and opportunities necessarily included in the public marketing of a film and the reputation garnered by association with the completed film in the film business. By the conduct of Koch and Cabin, plaintiffs have been excluded from marketing efforts, screenings of the film, professional association with the film and have lost the opportunity to meet with the representatives of MGM or other entities who have expressed interest in the film.

44. Plaintiffs are joint owners of the film, its story, and all related interests including copyright, income and interest in and to the funds and assets and property of the venture. This includes the film, which is contained in an electronic digital secure drive, in the possession of defendants. Plaintiffs also own a one half undivided interest in all other assets and related incidents of the documentary film such as tapes used and edited out or deleted to make the now existing version of the documentary film, transcripts, scripts, books, papers and ledgers of all types relating to the business of the venture and the production of the film.

45. Defendants have wrongfully exercised and assumed authority and control

14

over the venture's property, depriving plaintiffs of their rightful possession and ultimately denying plaintiffs' ownership interest in and to the property inconsistent with the plaintiffs' legal rights under the parties' contract.

46. Cabin and Koch's assumption of control of the joint venture's property was in willful and wanton disregard of the rights of Onyx and Marquez. As a direct and proximate result of defendant's conversion of the venture's property, the plaintiffs have been damaged and are entitled to recover the film and related property and assets and damages and any other such which may have been acquired in connection with the business of the venture.

47. As a result of the defendants' wrongful conduct the plaintiffs have been severely damaged and are entitled to damages in an amount to be determined at trial.

## COUNT II
## CONVERSION

48. Plaintiffs repeat and reallege all the other paragraphs contained herein as if fully set forth in this -count and incorporated herein by reference.

49. Defendants, with the intent to exclude plaintiffs and to treat the venture's assets as their sole property, in violation of the parties' agreement and in violation of fiduciary duties and duties of loyalty, good faith and fair dealing owed to plaintiffs, sold or otherwise alienated the film and related rights to MGM and perhaps others

15

in violation of the plaintiffs' ownership rights, copyright, rights to the film's profits, producer fees, film credits, raw film, archived and edited footage, expenses and other assets.

50. Defendants have willfully, wantonly and wrongfully and in violation of their legal, fiduciary and contractual duties converted the property of the venture to their own. They have refused to provide plaintiffs access and equal control over the film produced by the venture, access to the books and records, cancelled checks, bank statement, invoices, expenses for the venture, refused to provide any meaningful accounting with respect to the disbursements of the venture; refused and expelled plaintiffs from participation in essential steps in the completion of the venture including access to and commentary in collaboration with respect to editing and marketing the film, reimbursed themselves without accounting to plaintiffs.

51. Cabin and Koch's assumption of control of the joint venture's property was in willful and wanton disregard of the rights of Onyx and Marquez. As a direct and proximate result of defendant's conversion of the venture's property, the plaintiffs have been damaged and are entitled to recover the film and related property and assets and damages and any other such which may have been acquired in connection with the business of the venture.

52. As a result of the defendants' wrongful conversion, the plaintiffs have been severely damaged and are entitled to damages in an amount to be determined at trial.

## COUNT III
## CONSTRUCTIVE TRUST

53. Plaintiffs repeat and reallege all the other paragraphs contained herein as if fully set forth in this count and incorporated herein by reference.

54. Defendants improperly, unlawfully, and at the expense of Plaintiffs, excluded Plaintiffs from the venture taking its assets for their own as enumerated above.

55. Upon information and belief, the film and related assets have appreciated in value in an amount not yet to be determined.

56. Upon information and belief, Defendants have received and or will receive income and assets from the film and related property associated with the film indefinitely into the future.

52. A constructive trust should be imposed on the property of the joint venture, the documentary film and all related property and assets and all sums received and appreciated in the past, and to be received into the future, by Defendants in connection with the film and related assets.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1. Order declaring that Onyx and Marquez are equal owners of all the venture's assets including the film and all related rights and interests;
2. Order declaring that the assets of the venture including the documentary film and all related accoutrements are joint property of plaintiffs;
3. Order defendants to produce all agreements, contracts, assignments, or other obligations conveying any interest in the film and or related property to others;
4. Order defendants to disclose all accounting and banking records, receipts, disbursements and other documents evidencing income and disbursements and all other records of all fiscal sponsors all donations and receipts;
5. Order defendants to specifically account for any compensation they have received, how the amounts were calculated and all documentation supporting those amounts;
6. Judgment for compensatory damages against defendants in an amount to be determined at trial plus prejudgment and post judgment interest;
7. Judgment for punitive or exemplary damages against defendants as may be provided by law;
8. Enjoin defendants from further appropriation and disbursement of joint venture assets without permission of the Court.

9. Order imposing a constructive trust in favor of plaintiffs over all the funds and assets and property converted by defendants including the documentary film;

10. Award plaintiffs reasonable attorney's fees and cost for prosecuting this suit and as may otherwise be allowed by law;

11. Other relief that this Court finds applicable under the circumstances.

A trial by jury is demanded. **Plaintiffs**

**By Counsel**

**Date: December 18, 2019**

_____**/s/**_____

Mary Lynn Tate   VSB# 16085
Tate Law PC
16006 Porterfield Highway
Abingdon, Virginia 24210
276-628-5185
**Fax 276-628-5045**

mltate@tatelaw.com

19